

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 14, 2021

**BY ECF and BY EMAIL**
The Honorable Kimba M. Wood
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   Re: **United States v. James David Williams, 16 Cr. 436 (KMW)**

Dear Judge Wood:

  The defendant, James David Williams, is scheduled to be sentenced before Your Honor on December 17, 2021 in connection with the violations of supervised release set forth in the amended September 30, 2021 report of United States Probation Officer Sonales Gonzalez (the "Violation Report").[1] As set forth below, the Government respectfully submits that the Court should impose a sentence of 18 months' imprisonment—above the applicable United States Sentencing Guidelines (the "Guidelines") range of six to nine months' imprisonment—to be followed by the reimposition of a term of supervised release of 18 months.

**I. BACKGROUND**

  On June 28, 2016, Williams and his co-defendants Steven Brown and Gerald Seppala were arrested on charges of conspiring to commit wire fraud, substantive wire fraud, and conspiring to commit money laundering, as set forth in the third Superseding Indictment, *United States v. Williams, et al.*, S3 16 Cr. 436 (KMW) (S.D.N.Y. June 22, 2016) (Dkt. No. 1). The charges arose from the conduct of Williams and his co-defendants from in or about 2012 through in or about June 2016 related to a scheme to defraud investors in various film projects. The defendant was subsequently released on bail.

  In August 2017, Williams began cooperating with the Government. On September 21, 2017, Williams pleaded guilty, pursuant to a cooperation agreement, to the charges contained in the fourth Superseding Information, *United States v. Williams*, S4 16 Cr. 436 (KMW) (S.D.N.Y. Sept. 21, 2017) (Dkt. No. 95). Specifically, Williams pleaded guilty to conspiring to commit wire fraud, substantive wire fraud, and conspiring to commit money laundering from in or about 2002 through in or about 2016, in connection with the scheme to defraud film investors. Williams also pleaded guilty to two additional counts of substantive wire fraud and one count of

---

[1] The amended Violation Report was submitted to the Court by Probation Officer Gonzalez on December 10, 2021.

The Honorable Kimba M. Wood
December 14, 2021
Page 2

aggravated identity theft.  Williams remained at liberty after his guilty plea.

Following his guilty plea, the Government learned that the defendant had engaged in efforts to defraud investor victims following his arrest in June 2016, but he had not disclosed that conduct to the Government.  Williams ultimately admitted the full scope of that and other conduct to the Government and continued cooperating.  On March 22, 2018, Williams pleaded guilty, pursuant to a supplemental cooperation agreement, to the additional charges contained in the seventh Superseding Information, *United States v. Williams*, S7 16 Cr. 436 (KMW) (S.D.N.Y. March 22, 2018) (Dkt. No. 197).  Specifically, Williams pleaded guilty to one count of substantive wire fraud, one count of bank fraud, and one count of making false statements to law enforcement officials.  Williams was remanded at the time of his March 2018 plea.

On December 18, 2018, the defendant appeared before Your Honor for sentencing.  At that time, the Government moved pursuant to Title 18, United States Code, Section 3553(e), for the Court to sentence Williams in light of the factors set forth in Section 5K1.1(a)(1)(5).  The Court imposed a sentence of time served, to be followed by three years' supervised release.  As set forth in greater detail below, at sentencing, much of the discussion—and the Court's focus in imposing sentence—centered around the defendant's having learned from his criminal conduct and his plans for a different life upon his release from jail.  Mr. Williams addressed the Court, stating, among other things, "Your Honor, I stand here in front of you a much different man than the man that stood here in front of you on July 21st, 2016.  I have changed.  This system has changed me.  And I ask you for the ability for me to prove that to you by my actions moving forward from this point."  (Sent. Tr. at 19).  The Court also imposed forfeiture in the amount of $10,684,358.82 and restitution in the amount of $15,532,797.50.
.
The defendant's term of supervised release commenced on the date of sentencing, December 18, 2018, and is set to expire on December 17, 2021.[2]  Throughout his term of supervised release, the defendant has been supervised in his district of residence, the Central District of California.

---

[2] As set forth on the record at the time of the defendant's admission to the specifications, the expiration of the defendant's term of supervised release does not prevent this Court from imposing sentence, nor from reimposing another term of supervised release.  Pursuant to 18 U.S.C. § 3583(i), the "power of the court" to revoke a term of supervised release and impose a term of imprisonment and a further term of supervised release "extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation."  *See United States v. Spencer*, No. 04 Cr. 1156 (RJH), 2010 U.S. Dist. LEXIS 9518, at *1-3 (S.D.N.Y. Jan. 29, 2010) (finding that a revocation of supervised release that was imposed several months after the expiration of the term of supervised release fell within the "reasonably necessary" period for adjudication of the violation) (citing *United States v. Ramos*, 401 F.3d 111 (2d Cir. 2005)).

The Honorable Kimba M. Wood
December 14, 2021
Page 3

## II. THE VIOLATION CONDUCT

In the summer of 2019, the Government received information Williams had recently traveled to Hawaii. At the time, the Government understood that Williams lacked any significant financial means and was unable to make meaningful payments toward his restitution and forfeiture obligations. Accordingly, the report of Williams's travel to a destination at which he had frequently vacationed in the past raised concerns. When the Government inquired with the U.S. Probation Office in the Central District of California, the defendant's supervising Probation Officer furnished documents, provided by Williams, indicating that the travel was related to recently obtained employment with a yacht management company. The documents appeared similar in form and style to fraudulent documents prepared by Williams in connection with his underlying criminal conduct. Accordingly, the Government undertook to investigate the matter further. This investigation revealed, as set forth in greater detail below, that the defendant had repeatedly deceived the Probation Office, often using the tools he had deployed in the many years he committed fraud prior to his 2016 arrest, all in an apparent effort to secure permission to travel and to hide assets from the Probation Office.

The defendant first lied to the Probation Office about his employment, creating out of whole cloth a fictitious employer, supervisor, and need for work-related travel. The purported yacht management company, "Universal Yacht Management," was, in reality, entirely a creation of the defendant's.

In April 2019—a mere four months after he was sentenced to time served in his underlying criminal case—Williams submitted a request to travel to Florida for a job interview, attaching to his request an email purportedly from "Henry Marker," the "V.P. Operations" of Universal Yacht Management. (Violation Report at 3). In reality, neither Marker nor Universal Yacht Management exists; the email account that sent the email submitted to Probation was registered in or about April 2019 and was subsequently deactivated.

The defendant proceeded to weave an elaborate web of lies and deceit in order to mislead the Probation Office time and time again. In June 2019, the defendant submitted a monthly report to the Probation Office, under penalty of perjury, attesting that he had started work with Universal Yacht Management earlier that month and listing Marker as his supervisor. (*Id.*). On multiple occasions thereafter, Williams sought permission to travel for his purported employment, including to Hawaii, and received approval. (*Id.*). In support of these requests, Williams provided e-mails purportedly from Marker, as well as an address and telephone number for Universal Yacht Management ("Address-1" and "Telephone-1"). (*Id.*). In reality, Telephone-1 is subscribed to the defendant, and Address-1 is associated with a provider of virtual office services, which has no record of Henry Marker or Universal Yacht Management being located at or using its services. (*Id.*).

The defendant also created a website for his fictitious employer. Indeed, shortly after submitting the request to travel to Hawaii in July 2019, Williams paid for the domain name with his wife's credit card, although he claimed in registering the site that it was in the name of Henry

The Honorable Kimba M. Wood
December 14, 2021
Page 4

Marker. (*Id.* at 4). The website was renewed the following year. (*Id.*) The site claimed, among other things, that Universal Yacht Management was "an accredited management company" providing "virtual and shore-based superyacht management services," with a team that "includes veteran yacht management coordinators, captains and engineers whose collective experience is unmatched." The site provided an address for the business in Miami, Florida. None of the information provided on the site, of course, was true.

The defendant's elaborate efforts to convince the Probation Office he was employed by Universal Yacht Management, however, were not limited to what was necessary to secure permission for him to travel. Indeed, the defendant also took pains to hide from the Probation Office his true financial situation and what he was really doing for work, repeatedly submitting false information and fake documents.

On numerous occasions, the defendant provided the Probation Office with copies of what appeared to be paychecks issued to him by Universal Yacht Management. (*Id.*). Williams also provided a pay stub, purportedly issued by the fictitious company. The supposed paychecks were issued by Bank of America and were printed with the name "Universal Yacht Management" and a Miami, Florida address at the top. Each of the paychecks bore the same account number; purportedly, the account belonging to Universal Yacht Management. (*Id.*). In fact, the account belongs to Bridge Releasing, LLC. (*Id.*). Bridge Releasing may well be a name that is familiar to the Court. Williams pleaded guilty to committing additional film-financing fraud even after his arrest on his underlying criminal case, *see United States v. Williams*, S7 16 Cr. 436 (KMW), Count One; Bridge Releasing was the corporate entity Williams used to commit that fraud. This time around, Williams appears to have altered Bridge Releasing checks to make them appear as though they were issued by Universal Yacht Management, in an effort to further deceive the Probation Office. (Violation Report at 4).

In the course of his supervision, Williams also submitted multiple Personal Financial Statements, swearing each time, under penalty of perjury, that they were true and correct. (*Id.* at 5). In reality, the financial picture painted by these statements bore almost no relationship to the defendant's actual financial status or activity. Williams did not disclose the existence of the Bridge Releasing account at Bank of America, nor of Bridge Releasing as an active business interest at all. (*Id.*). Indeed, in his June 2020 financial disclosures, Williams indicated he received no monthly salary or wages beyond the $4,000 in monthly business income associated with his claimed work at Universal Yacht Management. (*Id.*). In truth and in fact, the defendant was receiving large sums of money related to ongoing efforts at film production. Indeed, between January 31, 2020 and December 15, 2020, the defendant—through Bridge Releasing—received in excess of $500,000 in transfers from an account in the name of "Eduardo Ramirez." (*Id.*). Based on its investigation to date, the Government believes that these transfers are related to the development and production of a documentary about the cult Nxivm.[3] Between in or about

---

[3] The defendant was incarcerated at the Metropolitan Detention Center (the "MDC") from March through December 2018. Keith Raniere, the founder of Nxivm, was also detained at the MDC for much of this period.

The Honorable Kimba M. Wood
December 14, 2021
Page 5

November 2019 and in or about December 2020, the Bridge Releasing Account also received in excess of $89,000 in wire transfers from other companies that appear to be involved in film production. (*Id.*). With regard to expenditures, the defendant appears to have used the funds in the Bridge Releasing account primarily for his everyday living expenses. (*Id.*).

### III. THE VIOLATION REPORT AND APPLICABLE GUIDELINES SENTENCE

The Violation Report in this matter was filed on September 30, 2021 and amended on December 10, 2021. On October 12, 2021, this Court issued a summons for the defendant's appearance in connection with the specifications set forth in the Violation Report. Specifically, the Violation Report outlined three violation specifications. First, that on or about April 11, 2019 and thereafter, the defendant failed to truthfully answer questions posed by a U.S. Probation Officer. (*Id.*). Second, that from in or about June 2019 through the present, the defendant failed to work regularly at a lawful occupation, in that he fraudulently reported employment at a fictitious company. (*Id.* at 3). And third, that from in or about June 2019 through the present, the defendant failed to disclose accurate financial information, in that he provided fraudulent pay stubs. (*Id.* at 4-5). On November 18, 2021, the defendant admitted all three specifications.

All three specifications set forth in the Violation Report are Grade C violations. (*Id.* at 2, 4). Accordingly, the applicable Guidelines sentence is three to nine months' imprisonment. (*Id.* at 6). The statutory maximum term of imprisonment that may be imposed following revocation of supervised release is two years. (*Id.* at 6). Pursuant to 18 U.S.C. § 3583(h), the Court may re-impose a term of supervised release following revocation of up to three years', less any term of imprisonment imposed upon revocation. (*Id.*).

### IV. THE APPROPRIATE SENTENCE

In light of the nature and circumstances of the violation conduct, and the need to specifically deter this defendant from future misconduct, a sentence of imprisonment above the Guidelines range is appropriate here. Indeed, for the reasons set forth below, the Government respectfully submits that the Court should impose a sentence of 18 months' imprisonment, to be followed by the reimposition of a term of supervised release of 18 months.

    A. <u>The Seriousness of the Offense</u>

This is the rare case where the Guidelines understate the seriousness of the violation conduct. For nearly all of the term of his supervision, the defendant lied to Probation—repeatedly, elaborately, and about subjects at the heart of his supervision. His actions evince a near total disrespect for the legal process which has, to date, afforded him so many opportunities to leave his life of fraud behind him.

The defendant's violation conduct is long-running and involved not just one bad choice, or even a handful of bad choices, but a concerted effort over the course of many months to

The Honorable Kimba M. Wood
December 14, 2021
Page 6

deceive Probation.  Indeed, the defendant went to great lengths to do that.  He created a fictitious company and supervisor; opened email accounts, a website, and telephone lines in furtherance of that fiction; and fabricated documents and financial records submitted to the Probation Office.  In doing so, he put the skills he developed over decades of criminal conduct to work in his post-conviction life, making the conduct at issue here especially disconcerting.

      The defendant's lies to Probation are particularly troubling and serious in light of their subject matter—his employment and financial circumstances.  The defendant did not just seek to evade the oversight of Probation because he wanted to take a vacation in Hawaii—though that, in and of itself, is, of course, problematic.  He also hid the true nature of the work he appears to have been doing in the entertainment business and lied about the amount of money to which he had access and his personal spending.  The defendant owes many millions of dollars in restitution and forfeiture.  As of late last week, he had made only $11,900 in payments toward the $15,532,797.50 he owes his victims in restitution.  The conditions of the defendant's supervised release governing the need for employment and Probation's oversight of his financial condition were implemented, at least in part, in recognition of the importance of those obligations.  Accurate reporting of the defendant's income enables the Probation Office, for example, to assess what amounts of restitution payments should be made.  To have returned to the industry that provided fertile ground for a life of fraud for many years, and to have done so in a way that hid that fact and his access to significant sums of money suggests that the defendant did not intend to forsake a life of crime or, at the very least, did not intend to comply with his financial obligations to his victims and the Government.

      An above-Guidelines sentence is also appropriate here in recognition of the fact that the defendant's conduct is hard to detect and makes him extremely difficult to effectively supervise.  The defendant has demonstrated his willingness and ability, time and again, to effectively deceive those around him, including by fabricating documents, checks, bank records, and corporate entities.  Indeed, it was largely a matter of happenstance that the defendant's violation conduct was discovered.  The Government received information in 2019 about the defendant's travel to Hawaii and, given its familiarity with the defendant's financial status at the time of his sentencing, as well as his outstanding restitution and forfeiture obligations, wondered how such travel had been possible.  At the time the Government then inquired with the Probation Office, the Probation Office did not suspect any wrongdoing on the defendant's part.  It was only after significant investigation that the full extent of the defendant's deceit was uncovered.

      In advance of sentencing, the defendant again seeks leniency from the Court, suggesting that he engaged in the instant violation conduct in conjunction with his efforts to rebuild his life by establishing a boat charter business and to "avoid the scrutiny" of the Probation Office's efforts to "scale back his expenses, although he was living a far from lavish lifestyle…." (Def. Mem. at 4-5).  The defendant claims that he used the Bridge Releasing bank account primarily to receive client and business associate funds and to pay business expenses, paying himself a modest salary.  (*Id.* at 5).  The defendant also claims that he "borrowed" $86,500 to pay personal and family expenses, with the knowledge of Mr. Ramirez.  (*Id.*).  Even if taken on their face, these claims do not negate the seriousness of the defendant's lies to Probation.  A desire to

The Honorable Kimba M. Wood
December 14, 2021
Page 7

"avoid the scrutiny" of supervised release, and to travel and do business at one's own direction, is hardly a justification for such conduct; surely, everyone on supervised release would prefer not to have to report to the Probation Office and be subject to the constraints of what is, after all, a central component of a criminal sentence.

The defendant's sentencing submission also paints a picture of an individual who, though dishonest with Probation, was careful to account for the funds his business associates and clients gave him and to spend in a manner consistent with his new lifestyle. This picture does not comport with reality. Indeed, what the defendant's attempts to explain and rationalize his conduct cannot obscure is that the defendant was, throughout his supervision, spending money in ways that raise serious questions about his judgment and conduct. On October 30, 2019, the Bridge Releasing account had a balance of $1.00. Between then and January 28, 2021, approximately $614,779 flowed into the account and, subsequently, out of the account. The vast majority of those funds—more than $564,243—came from Mr. Ramirez or from companies clearly associated with film production. Despite that, the distribution of funds out of the Bridge Releasing account does not appear to be consistent with business spending related to films. Indeed, during this same period, the defendant spent more than $168,000 on what appear to be boat- and marina-related expenses. He withdrew more than $52,000 in cash. He transferred more than $50,000 to pay credit card and car payment bills in his wife's name. He paid more than $17,949 in rent to what appears to be a luxury apartment building in Tempe, Arizona, where two of his children reside. He paid more than $11,500 in payments on a second car. He transferred thousands of dollars to his family members. And he paid the expenses of his everyday life—spending thousands of dollars at Costco, on airline tickets and hotels, and in tuition to his child's private high school, among other things.

Ultimately, the defendant's conduct is far more serious than the "cutting corners," he describes in his letter to the Court. He effectively negated any of the benefits—to himself or to the public at large—of the period of supervision imposed by the Court and did so in a way that demonstrated a willingness to go to great lengths to deceive others in furtherance of his own personal ends. A sentence of a significant period of incarceration—18 months' imprisonment— is necessary to promote respect for the law and to acknowledge the seriousness of the defendant's conduct.

B. <u>The Defendant's History and Characteristics and the Need for Deterrence</u>

A significant sentence of incarceration is also necessary to deter the defendant from future criminal conduct and in recognition of the fact that the defendant committed the instant violations despite being afforded numerous opportunities to rehabilitate himself, short of serving a substantial jail term.

Williams has been afforded every opportunity to turn his life around. In August 2017, he began cooperating with the Government, remaining at liberty even after his guilty plea. When it was discovered that he had lied to the Government in his initial meetings and had engaged in post-arrest fraud which he had failed to disclose, he was nevertheless permitted to continue

cooperating, having pleaded guilty to those additional offenses and been remanded. Most importantly, Williams was afforded extraordinary leniency at sentencing, in large part in recognition of the possibility for rehabilitation he had shown in accepting responsibility for his conduct and providing substantial assistance to the Government in the prosecution of his coconspirators. Williams's underlying offense was brazen. He defrauded dozens of victims of tens of millions through a long-running fraud scheme involving purported film investments. At his sentencing three years ago, the Guidelines range applicable to the defendant's conduct was 97 to 121 months' imprisonment; absent the Government's motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, he was also subject to the imposition of a mandatory consecutive term of two years' imprisonment as a result of his conviction under 18 U.S.C. § 1028A. The most similarly situated co-defendant, Steven Brown, was sentenced to 63 months' imprisonment, at the top of his applicable Guidelines range. Nevertheless, the Court sentenced the defendant to time served—approximately 9 months.

At the time of that sentencing, the defendant emphasized in his comments to the Court his recognition of how his conduct had hurt his victims and those who had trusted him. He stated, among other things:

> I stand here remorseful, your Honor, ashamed. If this is not hitting bottom, I don't know what is. Spending this past nine months being in prison, never leaving a building or seeing the sky, has been beyond humbling.
>
> I've seen awful things, and being 2500 miles apart from my family has been devastating. I've let down my family. I've let down my friends, many business partners, and many investors.
>
> I live in a shadow of the pain that I've caused, and I feel deeply for the people that trusted me.
>
> Your Honor, I've read over every one of the victim impact statements. They haunt me….

(Sentencing Tr. at 16-17). Later in the proceeding, he continued:

> I fully accept the responsibility for my actions. I will accept the sentence from this Court, and I will strive my hardest and commit to my fullest to work honestly to pay restitution to my victims and lead a law-abiding life….Your Honor, I stand here in front of you a much different man than the man that stood here in front of you on July 21st, 2016. I have changed. This system has changed me. And I ask you for the ability for me to prove that to you by my actions moving forward from this point.

(*Id.* at 19).

The Government, too, emphasized the change in the defendant through the course of his cooperation. Referring to the false statements the defendant made to the Government early in his cooperation, the Government stated:

> I have also seen the change in him since coming to grips with that, and pleading guilty a second time, and being incarcerated. And I think I would be abandoning my responsibilities to not tell your Honor that I have noticed a real change in how he talks about his crimes and his victims, particularly over the course of the last year or so.
>
> He is a person who, I think, having committed fraud for many, many years and being absorbed in a life that has been defined in some ways by that fraud, has, in my view, come to grips with it and started talking about it differently, much more in the way you heard from him today. And the nature of how he spoke about his victims, how he spoke about his own responsibility for his conduct really shifted in the course of this year in my many meetings with him….

(*Id.* at 23-24).

Ultimately, the Court highlighted the defendant's acceptance of responsibility and his apparent capacity for rehabilitation in imposing sentence. Speaking about and to the defendant, the Court stated:

> I believe him, and I believe Ms. Reilly, who very, I think, generously and candidly described your interactions with her. That's so important to rehabilitation, for you to be able to demonstrate to a judge that you are on a path to rehabilitation, and that you want to spend your time serving others, if you're allowed to by probation. I think that's very important.

(*Id.* at 27). The Court further remarked to the defendant that "it would be hard to find a white collar defendant as honest as you in accepting responsibility…." (*Id.*)

The defendant's sentencing took place on December 18, 2018. On April 11, 2019, the defendant submitted to Probation an email from a fictious person inviting him to interview for a job with a non-existent company. His efforts to "prove [] by my actions moving forward from this point" that he was a changed man had lasted less than four months.

A substantial sentence is necessary to deter this defendant from future criminal conduct, of which there seems be significant risk given the defendant's inability – despite having received

The Honorable Kimba M. Wood
December 14, 2021
Page 10

extraordinary leniency at sentencing – to mend his ways. As outlined above, the defendant's violation conduct was not just in service of unauthorized travel but, more troublingly, was carried out in what appears to be an effort to hide a return to the film business, the very business within which he has admitted to committing fraud for almost 20 years. Williams appears to be raising money for film projects and, for the most part, spending it on his personal expenses, much as he did in the course of his earlier criminal conduct. Moreover, while he has been deceiving Probation as to his financial position, Williams owes millions of dollars in restitution to the victims he defrauded. Clearly, none of the defendant's arrest, his initial guilty plea, his second guilty plea and subsequent incarceration, and his avoiding a significant prison sentence, had an impact sufficient to stop him from further deceit and misconduct. The defendant claims that it is only now that he has hit "a new bottom" and that his "experience has really sunk in with me."[4] (Def. Ex. A at 1-2). The Court has heard these kinds of words from the defendant before. Having seen how quickly the defendant nonetheless returned to his pattern of fabrication and lies, the Court should impose an above-Guidelines sentence in an effort to bring about in the defendant a real understanding of the consequences of his actions and the need for change. A strong, clear message must be sent to Williams that this compulsive deception and lying will lead to a substantial, meaningful period of imprisonment.

    C. The Merits of The Requested Sentence

As set forth above, the Court should impose a substantial term of imprisonment, in recognition of the seriousness of the violation conduct and the need to specifically deter the defendant from future violation or criminal conduct. The Court may impose a term of imprisonment only up to two years and a combined term of imprisonment and re-imposed term of supervised release only up to three years. A sentence of 18 months' imprisonment would not only be in accord with the seriousness of the offense and the need for deterrence, it would also permit the Court to impose a meaningful term of supervised release of 18 months, leaving the possibility of the imposition of an additional six months' incarceration should the defendant ever be found to have violated his conditions of supervised release again. This additional period of supervision is especially important in this case, where the defendant has significant outstanding restitution obligations and where, as a result of the defendant's misconduct, no meaningful supervision of efforts to build a law-abiding life has yet taken place.

---

[4] In seeking a sentence of home confinement, the defendant also emphasizes the impact a sentence of any term of imprisonment would impose upon his family, particularly financially. (Def. Mem. at 7). The defendant has a wife, two adult sons, and a daughter, who is approximately 18 years old. His family appears to be supported by their extended family and, in the case of his oldest sons, to live independently. The possible impacts on the defendant's family were entirely foreseeable to the defendant when he chose this course of conduct. Moreover, while the Government does not discount the consequences the defendant's actions have had and will have on his children and his wife, those consequences do not differentiate the defendant from many others who appear before Your Honor for sentencing, nor have they been enough, to date, to deter the defendant from misconduct.

The Honorable Kimba M. Wood
December 14, 2021
Page 11

## V. CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of 18 months' imprisonment, to be followed by a re-imposed term of supervised release of 18 months, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing and to address the unusual and troubling nature of the violation conduct at issue.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Katherine Reilly
Noah Solowiejczyk
Assistant United States Attorneys
(212) 637-6521/2473

cc: Anthony Cecutti, Esq. (By E-mail)
United States Probation Officers Sonales Gonzales and Alan Barahona (By E-mail)